

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 12, 2022

**VIA ECF**
The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Barry Williams, a/k/a "Bistro,"* **19 Cr. 846 (KPF)**

Dear Judge Failla:

      The defendant, Barry Williams, a/k/a "Bistro," is scheduled to be sentenced on Thursday, June 16, 2022, at 3:30 p.m., having pled guilty, pursuant to a plea agreement, to narcotics conspiracy, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A). The Government respectfully submits this letter in connection with sentencing.

      In the plea agreement, the Government calculated the defendant's Guidelines range as 324 to 405 months' imprisonment, with a mandatory minimum term of 120 months in prison (the "Guidelines Range"). In its Presentence Investigation report ("PSR"), the Probation Department calculates the same Guidelines Range, and recommends a sentence of 240 months' imprisonment. (PSR at 27.) For the reasons explained below, the Government recommends a sentence of 210 to 262 months, which it believes appropriately discounts the defendant's sentence on account of the crack-to-cocaine sentencing disparity, but also includes several aggravating factors as reflected in Title 18, United States Code, Section 3553(a).

**I.**     **Offense Conduct**

      **A. Overview of the Conspiracy**

      Barry Williams was a member of the AK Houses Crew (or the "Crew"), a prolific drug trafficking organization ("DTO") that operates in and around an apartment complex known as the "AK Houses," located at East 128th Street in the Harlem neighborhood of Manhattan. Presentence Investigation Report ("PSR") ¶ 19. As alleged in the Indictment, at least 12 individuals, and numerous unindicted co-conspirators, were members of the AK Houses Crew, and together conspired to distribute massive amounts of cocaine base ("crack") in the vicinity of the AK Houses.[1] *Id.* During the relevant time period in the Indictment, from May 2017 through

---

[1] A thirteenth member of the Crew was indicted on separate drug charges. *See United States v. Mitchell McPhee,* 19 Cr. 745 (RMB) (S.D.N.Y.).

November 2019, the AK Houses Crew sold at least hundreds of grams of crack to its customers on the streets of Harlem. *Id.*

Van Whitmore, Ronald Nixon and the defendant, among others, were the leaders of the AK Houses Crew and were responsible for obtaining supplies of powder cocaine; converting the cocaine into crack; pushing the crack to customers on the street through the Crew's network of street-level dealers; and maintaining order and discipline within the Crew, including with threats of violence. PSR ¶ 20. The Crew had access to multiple "stash houses" that were maintained in apartments in the AK Houses for the purpose of storing drugs and weapons. Mid-level members of the Crew fulfilled roles vital to the DTO, including managing and enforcing order within the Crew's network of street-level crack dealers, "correcting" individuals who were selling drugs in the wrong places or acting too conspicuously, and collecting proceeds from the crack sales to finance the Crew's operations. *Id.* The younger members of the Crew—the street-level crack dealers—obtained crack from the Crew leadership and sold the drugs to the Crew's customers on the street. *Id.*

The AK Houses Crew is notable for its hierarchy and the control it exerted over the multi-block area in which it operated. The Crew sold crack in the vicinity of 130th street to 123rd street in Manhattan; including, among other locations, the area of the AK Houses on East 128th Street; the Metro-North commuter rail station at East 125th Street; and Public School #30 at East 128th Street. PSR ¶ 21. Leaders of the Crew, such as Williams, determined who could be present on the block and who could not be. PSR ¶¶ 47-48. Individuals who were unwelcome by the leadership, or who were selling drugs on the side without paying tribute to the Crew, were run off the block. Williams, in particular, was known for arbitrating disputes and granting "approval" to individuals to sell crack to customers. *Id.* The leadership, including Williams, used threats of violence, assaults, and shootings to enforce order and to maintain discipline among younger members of the Crew, or against unwanted outsiders who wandered into the territory. This structure and discipline allowed the Crew to freely engage in daily drug sales. Thus, during the relevant time period, members of the Crew sold hundreds of grams of crack to customers under Williams' supervision. Indeed, law enforcement seized more than 300 grams of crack that was sold to undercover law enforcement officers in the vicinity of the AK Houses over the course of more than approximately 60 transactions, each of which was documented by hidden recording devices. PSR ¶ 21. In addition, during the course of the narcotics conspiracy, co-defendants including Sharod Bell and Ian Haylock sold firearms to undercover law enforcement officers in Harlem in connection with the drug sales. *Id.*

### B. Williams's Background

Williams is a 44-year-old individual with little prior employment history and extensive prior criminal history, including narcotics offenses and assaults. The PSR explains that Williams began using controlled substances at the age of 13 and has struggled with drug addiction throughout his life. PSR ¶¶ 111, 14. He has participated in substance use treatment in the past, but relapsed. PSR ¶¶ 112-13. Williams's parents are deceased; he reported having three siblings, which whom he maintains a good relationship. PSR ¶ 96.

Overall, Williams reported that he had a "hard" childhood, in an environment with "a lot of drugs." PSR ¶ 97. His mother abused crack cocaine and PCP throughout her life, and once

sold their Christmas gifts for drug money. *Id.* Williams's parents separated when he was approximately 14 years old and his father remained in his life as a steady and "traditional" figure who provided for his children, including by taking Williams on fishing trips and teaching him how to read. *Id.* Williams had a long-running relationship with a woman named Erica Santiago from 1999 through 2018, and has reported that discovering her infidelity "crushed" him and almost destroyed his will to live. PSR ¶ 100. Williams has two children with two different partners—a 26-year-old son named Khali Woods, and a two-year-old daughter named Ayanna. PSR ¶¶ 98, 101. Shatya Blount, Williams's girlfriend (and the mother of Ayanna), suffers from sickle-cell anemia and lupus. PSR ¶ 101. Blount has known Williams since she was a teenager and has described him as a "wonderful person" who had a "hard life" and lacked guidance, but who was starting to pull his life together when he was arrested. PSR ¶ 102.

### C. Williams's Involvement in the DTO

Williams was a major source of supply and a manager of the AK Houses Crew. PSR ¶ 45. Williams and the AK Houses leadership co-conspirators were obtaining about one kilo of cocaine per week and cooking it down to crack. *Id.* Then Williams, and co-defendants Whitmore, and Nixon, distributed the crack to lower members of the crew for resale on the street. *Id.*

In addition, Williams was observed on numerous occasions by undercover NYPD officers monitoring drug activities and facilitating street sales on behalf of younger members of the conspiracy. PSR ¶ 46. For example, on July 20, 2018, an NYPD undercover officer ("UC-1") purchased four zips of crack cocaine in front of 126 East 126th street for $40 from members of the AK Houses Crew. *Id.* UC-1 observed these members of the Crew engage in a narcotics-related conversation with Williams. *Id.* Williams was overheard instructing the younger members of the conspiracy that they were not selling narcotics properly, and Williams then proceeded to correct their error. *Id.*

On August 3, 2018, UC-1 was approached by Williams in front of 126 East 126th Street with a group of unknown individuals. PSR ¶ 47. Williams was on the phone and stated to the group, including UC-1, that "he" is coming right now, and that "he" went to get something to eat at McDonald's. *Id.* Williams then remained at the location for a period of time while an AK Houses street-level dealer arrived at the location. *Id.* Williams could then be heard saying "he is right here." *Id.* Williams thereafter facilitated this transaction, in which UC-1 purchased three yellow mini capsules of crack cocaine with from another AK Houses Crew member. *Id.*

As mentioned, NYPD undercover officers also observed Williams facilitate street-level crack sales or grant "approval" for such sales to occur. PSR ¶ 48. For example, in another sale, on August 29, 2018, UC-1 was involved in an apparent dispute over a sale of crack by the AK Houses Crew. *Id.* Williams intervened to end the dispute by stating, in sum and substance, "just give it to him"—after which another member of the Crew approached UC-1 and ended the dispute by throwing four mini capsules of crack cocaine on the ground in front of UC-1. *Id.* Many of these interactions were further documented by undercover officer video, or by an NYPD camera that was surveilling the AK Houses Crew's activities. *Id.*

In his role as a leader of the conspiracy, Williams is being held responsible for at least 8.4 kilograms of cocaine base, but not more than 25.2 kilograms of cocaine base.

The Crew was charged in a two-count indictment that charged Williams and 11 other individuals with conspiring to distribute and possession with intent to distribute 280 grams and more of cocaine base in violation of 21 U.S.C. §§ 846, 841(a), and 841(b)(1)(A) ("Count One"). In addition, five of Williams's co-defendants were also charged with knowingly possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2 ("Count Two").

The defendant was arrested on December 12, 2019, and has been detained since that time. PSR at 1. On February 16, 2022, the defendant appeared before this Court and pled guilty as charged in Count One of the Indictment. PSR ¶ 5. At his change of plea proceeding, the defendant stated that he agreed with other people to possess with intent to distribute 280 grams or more of crack cocaine. PSR ¶ 65. Williams further suggested that he sold drugs to support his personal substance use habit. *Id.* ¶ 66. He admitted that he made a "mistake" and "did something wrong." *Id.* He also related that he would like the Court to know he is not a "bad person," and he does not "hurt" people. *Id.*

### D. The Applicable Guidelines Calculations

The plea agreement calculated an offense level of 36, a Criminal History in Category VI, and an overall Stipulated Guidelines Range of 324 to 405 months in prison. The plea agreement calculations included two criminal history points that were added because the defendant was on federal supervised release when he was charged with the offenses in the Indictment.[2]

The Government requests that when fashioning an appropriate sentence, the Court consider the crack-to-cocaine sentencing disparity, as follows.

As the Court is aware, on June 22, 2021, the U.S. Department of Justice provided public testimony in support of the EQUAL Act, S.79. This proposed legislation would eliminate the powder-to-cocaine base sentencing disparity in 21 U.S.C. §§ 841 and 960. Although the Department supports elimination of the powder-to-cocaine base disparity, until legislation to that effect is passed, the current statutory and guidelines provisions remain in effect. In this case, if the powder cocaine Guidelines were instead applied to the same amount of cocaine base applicable to this case (17.36 kilograms), the base offense level would be 32. With adjustments for both the defendant's managerial role and his acceptance of responsibility, the overall offense level would remain 32, and the Guidelines sentencing range based on the parties' calculations under Criminal History VI would be 210 to 262 months' imprisonment. *See* PSR at 29. The Court can and should, consistent with the law and current sentencing framework, consider the powder-to-cocaine base disparity in assessing the Section 3553(a) factors. *See Kimbrough v. United States*, 552 U.S. 85, 106-08 (2007); *United States v. Cavera*, 550 F.3d 180, 191-92 (2d Cir. 2008) (*en banc*).

---

[2] This increase results from the defendant's December 22, 2006 conviction in the Southern District of New York of distribution and possession with intent to distribute cocaine base, and conspiracy to commit the same, in violation of 21 U.S.C. §§ 841 and 846. The defendant was sentenced to a 10-year term of imprisonment and four years' supervised release; his parole commenced on April 1, 2016, approximately one year before his involvement in this offense began. *See* PSR ¶ 84.

Based on this consideration of the powder-to-cocaine base disparity and all the relevant factors under Section 3553(a) as set forth below, the Government believes a sentence below the Stipulated Guidelines range in the plea agreement is appropriate. However, as stated below, given the presence of significant aggravating factors that the Court can consider under Section 3553(a), the Government respectfully requests that the Court impose a sentence within the range of 210 to 262 months in prison, which would be Williams's Guidelines sentence if the Court were to accept the crack to cocaine disparity calculations.

## II.    Discussion

### A.  Applicable Law

As the Court is aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* & n.6. Those factors make the Government's recommended sentence of 210 to 262 months in prison appropriate in this case.

### B.  Sentences Faced by Co-Defendants

To assist the Court in assessing the relative culpability of the defendants, the Government provides the following chart of the defendants in this case, listed approximately in their order of culpability (from most to least culpable):

| Defendant | Criminal Offense(s) | Mandatory Minimum (months) | Guidelines Range[3] (months) | Guidelines Range under Equal Act (months) | Sentence of Imprisonment (months) |
|---|---|---|---|---|---|
| Van Whitmore, a/k/a "V-High" | 18 U.S.C. § 846<br>18 U.S.C. § 924(c) | 120 (60 + 60 consecutive) | 322 to 387 | 228 to 270 | |
| Ronald Nixon, a/k/a "Jeter" | 18 U.S.C. § 846<br>18 U.S.C. § 924(c) | 120 (60 + 60 consecutive) | 322 to 387 | 228 to 270 | |
| Barry Williams, a/k/a "Bistro" | 18 U.S.C. § 846 | 120 | 324 to 405 | 210 to 262 | |

---

[3] The Guidelines ranges reflected in this chart are based on the parties' calculations as outlined in the defendants' respective plea agreements and may be revised, subject to the Probation Department's Guidelines calculations and the Court's findings regarding the applicable Guidelines ranges.

| Defendant | Criminal Offense(s) | Mandatory Minimum (months) | Guidelines Range[3] (months) | Guidelines Range under Equal Act (months) | Sentence of Imprisonment (months) |
|---|---|---|---|---|---|
| Rodney Robinson, a/k/a "Stretch" | 18 U.S.C. § 846 | 60 | 168 to 210 | 108 to 135 | |
| Ian Haylock, a/k/a "E" | 18 U.S.C. § 846 18 U.S.C. § 924(c) | 60 | 195 to 228 | 87 to 108 | |
| Malik Hawkins[4], a/k/a "Leeky" | 18 U.S.C. § 924(c) | 60 | 60 to 327[5] | N/A | |
| Abdoul Hanne, a/k/a "Buylot" | 18 U.S.C. § 846 | 60 | 151 to 188 | 100 to 125 | 90 |
| Malik Breedlove, a/k/a "LB" | 18 U.S.C. § 846 | 0 | 87 to 108 | 63 to 78[6] | |
| Anthony McDade, a/k/a "Pap" | 18 U.S.C. § 846 | 0 | 78 to 97 | 51 to 63 | |
| Tyrell Murphy[7], a/k/a "Fat Cat" | 18 U.S.C. § 846 18 U.S.C. § 922(n) | 0 | 78 to 97 | 57 to 71[8] | 51 |
| Sharod Bell, a/k/a "Rodo" | 18 U.S.C. § 924(c) | 60 | 60 | N/A | 60 |

**C. A Sentence of 210 to 262 Months In Prison Is Appropriate In This Case**

The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and others who are similarly situated, and to promote respect for the law. 18 U.S.C. § 3553(a)(2)(A)-(C). These considerations weigh in favor of the sentence recommended by the Government. In contrast, the defendant has indicated in communications between the Government and defense counsel that he intends to request that the Court impose the statutory minimum sentence of 120 months in prison. Given the defendant's extensive criminal history, and the other factors discussed herein, the Government's view is that the statutory minimum sentence does not fairly encapsulate all the relevant aggravating factors inherent in this defendant's conduct.

*First*, the Court should consider the seriousness of the offense, and the defendant's involvement in it. Here, the defendant was a high-level manager of the Crew members, as well as a significant source of the supply of the Crew's drugs. *See* PSR § 45. Williams, along with

---

[4] Hawkins' change of plea hearing is scheduled for June 21, 2022.

[5] Subject to determination regarding career offender status, pursuant to U.S.S.G. § 4B1.1(a).

[6] The Government's sentencing submission for Breedlove miscalculated the impact of the EQUAL Act as resulting in a Guidelines range of 57-71 months in prison, as the Government will explain during Breedlove's sentencing hearing.

[7] Murphy was sentenced by Hon. Ronnie Abrams in S3 19 Cr. 846 (RA).

[8] In the defense sentencing submission, the defense misapplied the applicable offense level adjustment pursuant to U.S.S.G. § 2D1.1(a)(5)(B)(i), and therefore mistakenly calculated the applicable Guidelines range under the EQUAL Act as 51 to 63 months' imprisonment.

Whitmore and Nixon, was obtaining approximately one kilogram of cocaine per week and cooking it down to crack cocaine for the Crew's distribution. Given that quantity, Williams and the two leaders would be estimated to be responsible for obtaining and converting more than 100 kilograms of cocaine during the time period charged in the Indictment. The Crew controlled all aspects of the crack cocaine trade in the vicinity of 125th Street. Crew members whom Williams managed and oversaw were known to use violence to enforce order in the area where they operated, which was generally between 123rd Street and 130th Street. Indeed, the NYPD reports that it investigated a number of shootings in upper Manhattan following the arrest of the individuals in the Indictment, which were attributed in part to a "power vacuum" caused by the arrests, and by positioning by others looking to fill that vacuum.

Thus, the sale of crack in this area directly led to violence, and as the Indictment and subsequent pleas attest, Crew members also bought and sold firearms as a matter of course in order to enforce their trade. The Crew ran off interlopers with assaults and the use of firearms. Residents in the community complained repeatedly to the NYPD about the violence in their neighborhood, as well as the constant sale of crack in the vicinity of the AK Houses; including on the street, in the building courtyards, and in stash houses inside the AK Houses. Accordingly, Williams's abject disregard for the well-being and the safety of others in his community warrants the recommended sentence sought here.

*Second,* the Court should consider relative culpability. The evidence at trial would have shown that the defendant was the primary manager of the Crew, just one step below the two leaders (Whitmore and Nixon). While the applicable offense conduct enhancements reflect Williams's managerial role within the Crew, it is also notable that Williams both supplied and/or cooked the crack cocaine that the Crew sold and actively monitored street sales and instructed Crew members. *See* PSR ¶¶ 46-48. He was a critical and active member of the Crew, without whom the Crew would not have been as successful as it was.

The previous defendants to be sentenced have been significantly younger, street-level dealers within the Crew. Williams is in a different stratosphere than those co-defendants, as described herein. Williams has already been in the position of those younger street-level dealers, in his prior crack cocaine case before this Court and, as explained below, came away from that experience not with a will to live a law-abiding life, but with a commitment to rise through the ranks of the Crew and become a high-level member.

Moreover, the Government does not credit Williams's explanation that he sold crack to support his personal substance use habit. *See* PSR ¶ 66. Given Williams's multiple prior drug convictions, including a prior federal controlled substances case that resulted in Williams serving a ten year prison sentence, the Government believes that Williams is a savvy individual who believes it will benefit him most to present himself as an addict, rather than as a drug dealer and Crew manager.[9] In reality, the evidence at trial would have shown that Williams was a major architect of the AK Houses Crew's successful control of the 125th Street and Lexington area in upper Manhattan. Williams's direction over the younger members in the conspiracy, and his

---

[9] *Cf. also* PSR ¶ 84 (According to the VOSR report, Williams "gave the appearance of being motivated to make the necessary changes needed to be successful and a lawful member in society, nonetheless, he was engaged in criminal activities as evidenced by his new arrest.").

oversight over the volume of drugs being sold, demonstrates that Williams was far more integral to the conspiracy than he would be if he were merely "motivated to participate in the offense conduct to support his personal substance use habit." PSR at 28.

Likewise, the Government does not credit Williams's assertion at his change of plea proceeding that he does not "hurt" people. PSR ¶ 66. Selling distribution quantities of crack cocaine, of course, causes great harm to society—as Williams knows firsthand, because he saw how his own mother abused crack cocaine and PCP throughout her life up until her death, and indeed, even sold their Christmas gifts for money to purchase drugs. *Id.* ¶ 97. But beyond just the detrimental sale of vast quantities of drugs, Williams's own criminal history also displays a consistent propensity to "hurt" people. These offenses include a gun-point robbery when he was 18 years old (PSR ¶ 81), an assault conviction when he was 40 years old (PSR ¶ 86), and more than 35 violations across various prison stints, including episodes of harassment and possession of a weapon (*id.* ¶ 82), fighting, violent conduct, and causing disturbances (*id.* ¶ 83), possession of a weapon and assault (*id.* ¶ 84), and pushing and shoving prison officials when they attempted to apply hand restraints during a dispute regarding drug contraband that was brought into the prison. (*Id.* ¶ 85).

*Third*, a sentence within the Guidelines Range is necessary to promote respect for the law and to deter this defendant and others who are similarly situated from participating in drug trafficking and firearms offenses. Nearly all of the defendants in this case have prior criminal records, and nearly all of them have prior offenses relating to drug dealing. Williams, like most of the other defendants, has multiple drug and violence charges. In most cases, the sentences imposed in the past did not seem to deter the members of this Crew from further criminal activity.

With respect to Williams in particular, even his significant criminal history and the resultant terms of imprisonment he has served have had little to no deterrent effect on his conduct. Williams is 44 years old and has been in prison approximately one-third of his life, or approximately 14.5 years cumulatively, for various drug- and violence-related convictions. As the Court is aware, he has been subject to significant prison time for the precise offense to which he pled in this case. In 2006, this Court imposed a sentence of 120 months' imprisonment for Williams's federal crack cocaine offenses. While serving his ten-year sentence in that case, Williams had more than a dozen sanctions for prison offenses, including the possession of weapons, assault, and drug possession. *See* PSR ¶ 84. Yet, despite serving ten years in prison for dealing crack cocaine, Williams returned to that very conduct approximately one year into his term of supervised release—but in an even more culpable role, as a major source of the Crew's supply of drugs and a manager of lower-level Crew members.

Thus, the PSR is undoubtably correct when it states that: "Williams' past terms of imprisonment have failed to deter him from returning to criminal activity." PSR at 28. Not only is the lack of deterrence relevant to the Court's consideration here, but also, the Court should take note of the prompt return to criminality that ensued after nearly every contact with the criminal justice system. The imposition of a significant sentence is warranted here, because all previous contacts with the criminal justice system have had no impact on Williams's propensity to engage in serious narcotics and violent crime activities.

In sum, a sentence of 210 to 262 months in prison adequately would balance the various considerations under § 3553(a) and achieve the statute's stated objectives.

### III. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 210 to 262 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLAIMS
United States Attorney

By: _____
Juliana N. Murray / Louis A. Pellegrino
Assistant United States Attorneys
(212) 637-2314 / -2617